

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

WAGGONER CARR
ATTORNEY GENERAL

November 12, 1965

Honorable Robert S. Calvert
Comptroller of Public Accounts
Austin, Texas

Opinion No. C-543

Re: Whether distributing agents,
now defined in H.B. No.
474, Section 4A, who qualify
as distributors, will be
required, under this Article,
to affix cigarette stamps
or meter impressions to
all unstamped cigarettes
stored in such a person's
place of business that
are designated for dis-
tribution or first sale
to other distributors,
wholesalers and retailers
that now hold permits
within the State of Texas,
before such cigarettes

Dear Mr. Calvert:

leave their place of business.

You have requested the opinion of this office on the
following questions:

"1. Will distributing agents, now defined
in H.B. No. 474, Section 4A, who qualify as
distributors be required under this Article to
affix cigarette stamps or meter impressions to
all unstamped cigarettes stored in such a person's
place of business that are designated for dis-
tribution or first sale to other distributors,
wholesalers and retailers that now hold permits
within the State of Texas, before such cigarettes
leave their place of business?

"2. As Section 4B of H.B. No. 474 repeals
Section 2 of 7.23, what effect will this have
on 7.01 (16) and 7.23 (1) (3) (4)?"

Section 4A and 4B of House Bill No. 474, Acts 1965, 59th Legislature, Chapter 580, Page 1262, reads as follows:

"Sec. 4A. Section (1) of Article 7.23, Title 122A, Taxation-General, Revised Civil Statutes of Texas, 1925, is hereby amended to read as follows:

"'(1) Every distributing agent who stores cigarettes in the State for delivery in this State, except to an exempt consignee, shall be treated as a "distributor" and shall be, except as in this Section provided, subject to the provisions of this Chapter regulating "distributors" and cigarettes stored in such a person's place of business for distribution in this State shall be considered possessed for the purposes of making a "first sale" in Texas within the meaning of this Chapter and such a person shall pay the taxes assessed by this Chapter and affix the stamps as for a "first sale" in the manner provided in this Chapter, except that such a person shall be required to affix said stamps only prior to the time that such cigarettes shall leave the warehouse of such a person for a delivery in this State except to an exempt consignee. Such a distributing agent shall be subject to the licensing provisions applicable to a distributor as provided in Article 7.09 of this Chapter, as amended, except that persons holding a valid permit as a distributing agent at the effective date of this law may continue in business under such permits, subject to the terms and regulations of this law, until the expiration thereof at which time such a distributing agent must obtain a distributor's permit under the terms and conditions set forth in Article 7.09 of this Chapter, as amended, and no persons subject to this Article who are lawfully engaged in the business as a distributing agent on the date of the enactment of this law shall be denied the right to carry on such business pending reasonable opportunity to make application for permit and final action thereon.'

"Sec. 4B. Section (2) of Article 7.23, Title 122A, Taxation-General, Revised Civil Statutes of Texas, 1925, is repealed."

The term "distributing agent" is defined in Article 7.01 (16) of Taxation-General of Vernon's Civil Statutes, which is a part of what is commonly known as the Cigarette Tax Law. Such Section reads as follows:

"(16) 'Distributing Agent' shall mean and include every person in this State who acts as an agent of any person outside the State by receiving cigarettes in interstate commerce and storing such cigarettes subject to distribution or delivery upon order from said person outside the State to distributors, wholesale dealers and retail dealers. . . ."

The rate of tax is specified by Article 7.02 and Article 7.06 of the Cigarette Tax Law and is imposed upon "all cigarettes used or otherwise disposed of in this State for any purpose whatsoever." Such Articles further provide that:

"The said tax shall be paid only once by the person making the 'first sale' in this State and shall become due and payable as soon as such cigarettes are subject to a 'first sale' in Texas, . . ."

The term "first sale" is defined in Article 7.01 (8) of the Cigarette Tax Law, which reads as follows:

"(8) 'First Sale' shall mean and include the first sale or distribution of cigarettes in intrastate commerce, or the first use or consumption of cigarettes within this State."

Article 7.02 (3) of the Cigarette Tax Law provides as follows:

"(3) The impact of the tax levied by this Chapter is hereby declared to be on the vendee, user, consumer or possessor of cigarettes in this State and when said tax is paid by any other person, such payment shall be considered as an advance payment and shall thereafter be

added to the price of the cigarettes and recover-
ed from the ultimate consumer or user. . . ."

Article 7.08 (2) of the Cigarette Tax Law requires
that the State Treasurer supply stamps to persons required to
stamp cigarettes at a discount of 2-1/4% of the face value of
such stamps.

All cigarettes sold and consumed in Texas are manu-
factured outside the State and shipped into this State by the
manufacturer. The cigarettes are manufactured by: American
Tobacco Company; Brown and Williamson Tobacco Company; Liggett
and Meyers Tobacco Company; P. Lorillard Company; Phillip
Morris, Inc.; and R. J. Reynolds Tobacco Company, all of which
are foreign corporations with a certificate of authority to
transact business within the State of Texas. At the present
time there are ten warehouses within the State which are
licensed as distributing agents and which receive and distri-
bute cigarettes on behalf of the manufacturing companies.

Each of the manufacturers employ a number of persons
in Texas who promote the sale of cigarettes within the State
and who occasionally receive orders for cigarettes which in
turn are relayed by them to a wholesale dealer or distributor.
All orders for cigarettes are sent to the home office of the
out-of-state manufacturer for approval and acceptance.

Representatives of the Comptroller's Office have
inquired into and ascertained the details involved in the
shipment to, and distribution from, Universal Terminal Warehouse
located in Houston, Texas. The facts revealed by this inves-
tigation will be taken as typical of the operation of all ware-
houses in Texas now holding permits as distributing agents.

Except for an insignificant number of "drop shipments"
specifically covered by Article 7.01 (9) of the Cigarette Tax
Law, all cigarettes sold within this State are shipped into
the State by the manufacturer in railroad freight cars or
common carrier trucks. The cigarettes are shipped pursuant
to bills of lading showing the shipment to be from the manu-
facturer, consigned to the manufacturer in care of a particu-
lar distributing agent warehouse. The manufacturer retains
title to the cigarettes. Upon arrival at the warehouse of
the distributing agent, the cigarettes are unloaded, placed
in the warehouse, and a check sheet verifying the arrival of
the shipment of cigarettes is returned to the manufacturer.

No warehouse receipt is issued. Once the cigarettes enter the warehouse of the distributing agent they are removed only pursuant to the order of the manufacturer. All orders directing the distribution of the cigarettes are transmitted from the manufacturer to the distributing agent by mail, teletype or telephone. Distributions from the warehouse are on bills of lading from the manufacturer to the purchaser. Shipping charges are paid by the manufacturer direct to the carrier and the purchaser is billed for the cigarettes by the manufacturer. The distributing agent ships the cigarettes from the warehouse on a "first in - first out" basis and is compensated for its services according to the volume of cigarettes handled, calculated on a flat rate per hundred weight. Frequent audits of the cigarette stocks on hand in the warehouses of the distributing agents are made at unscheduled times by the manufacturers. The Comptroller's investigation of Universal Terminal Warehouse disclosed that the average supply of cigarettes in such warehouse at all times is sufficient to meet average daily demands for 13 working days.

The Comptroller's Office has made an analysis of the inventory of cases of cigarettes on hand at each of the ten distributing agents for the month of December, 1964, in order to show a typical monthly operation of these facilities. The average days supply on hand and the average daily deliveries are based upon a monthly delivery period of twenty-one days. Rather than naming the distributing agents we are for convenience simply numbering them from 1 to 10 in the table that follows. In relating the quantities of cigarettes listed in this table to shipments into the State, we are informed that a carload of cigarettes consists of approximately 1,250 cases of cigarettes.

| WAREHOUSE NUMBER | CASES DELIVERY DECEMBER, 1964 | DAILY CASE DELIVERIES | NUMBER OF CASES ON HAND OF DECEMBER, 1964 | AVERAGE DAYS SUPPLY ON HAND AVAILABLE FOR DELIVERY |
|---|---|---|---|---|
| 1 | 8,775 | 418 | 6,309 | 15 |
| 2 | 20,104 | 957 | 11,661 | 12 |
| 3 | 6,212 | 296 | 3,798-58/60 | 13 |
| 4 | 8,468 | 403 | 12,385 | 30-1/2 |
| 5 | 6,539 | 311 | 5,232-14/60 | 17 |
| 6 | 19,050 | 907 | 12,465 | 14 |
| 7 | 21,934 | 1,044 | 11,759-30/60 | 11 |
| 8 | 45,302 | 2,157 | 24,406-45/60 | 11 |
| 9 | 3,244 | 154 | 1,479 | 9 |
| 10 | 34,951 | 1,664 | 21,613-22/60 | 13 |

The cigarettes are shipped by the manufacturer in cardboard containers known as cases. Each case contains 60 cartons of cigarettes; each carton contains 10 packages of cigarettes; and each package contains 20 cigarettes. The Cigarette Tax Law requires that the tax stamp be affixed on each package of cigarettes. In order to accomplish this, it is necessary that the cases be opened and the cartons placed upon a machine which opens the cartons, affixes the stamp to each package, and reseals the cartons which are then replaced in the cases and the cases resealed.

The tax imposed by the Cigarette Tax Law is, by Article 7.02 (3), declared to be a tax imposed upon the ultimate consumer or user of cigarettes within this State, and when the tax is paid by any other person it is to be considered an advance payment and must be added to the price collected from the ultimate consumer or user. This tax is clearly a use tax. A formidable line of decisions by the Supreme Court of the United States have sustained the imposition of use taxes against the challenge of the commerce clause and the due process clause of the United States Constitution. Scripto v. Carson, 362 U.S. 207 (1960); General Trading Co. v. Tax Commissioner, 322 U.S. 335 (1944); Nelson v. Montgomery Ward, 312 U.S. 373 (1941); Nelson v. Sears, Roebuck & Co., 312 U.S. 359 (1941); McGoldrick v. Berwind-White Coal Co., 309 U.S. 33 (1939); Southern Pacific Co. v. Gallagher, 306 U.S. 167 (1939); Felt & Tarrant Mfg. Co. v. Gallagher, 306 U.S. 62 (1939); Henneford v. Silas Mason Co., 300 U.S. 577 (1937); Monamotor Oil Co. v. Johnson, 292 U.S. 86 (1934).

Although these cases are not completely determinative of the question before us---because of the restrictive definition of "first sale" in the Cigarette Tax Law---we nevertheless feel that a discussion of these cases, with relevant quotations, is essential to an understanding of taxes of this nature and their relation to the interstate commerce clause of the United States Constitution. For a comprehensive study of the decisions of the Supreme Court of the United States on the subject of state powers of taxation and regulation as they relate to the commerce clause see: Hartman, State Taxation of Interstate Commerce, 46 Virginia Law Review 1051 (1960).

In each of the above cited cases the tax was levied upon the use, consumption, storage, or transfer of possession of tangible personal property within the taxing state. The ultimate burden of the tax was imposed upon the purchaser of the property.

Southern Pacific Co. v. Gallagher, 306 U.S. 167 (1939) and Henneford v. Silas Mason Co., 300 U.S. 577 (1937) both involved a state tax imposed upon the use or storage of property purchased out-of-state which was required to be paid to the State by the purchaser. Southern Pacific Company purchased materials and supplies out-of-state and brought them into California for use in the operation of its interstate railroad business; Silas Mason Company purchased machinery out-of-state which was brought into Washington for use in the construction of the Grand Coulee Dam. In both instances the Court upheld the tax against the contention that it was a tax on interstate commerce.

". . .State taxes upon national commerce or its incidents do not depend for their validity upon a choice of words but upon the choice of the thing taxed. It is true, the increased cost to the interstate operator from a tax on installation is the same as from a tax on consumption or operation. This is not significant. The prohibited burden upon commerce between the states is created by state interference with that commerce, a matter distinct from the expense of doing business. A discrimination against it, or a tax on its operations as such, is an interference. A tax on property or upon a taxable event in the state, apart from operation, does not interfere. This is a practical adjustment of the right of the state to revenue from the instrumentalities of commerce and the obligation of the state to leave the regulation of interstate and foreign commerce to the Congress." 306 U.S. 167, 177-178.

"The tax is not upon the operations of interstate commerce, but upon the privilege of use after commerce is at an end.

". . .The privilege of use is only one attribute, among many, of the bundle of privileges that make up property or ownership. Nashville, C. & St. L. Ry. Co. v. Wallace, supra, Bromley v. McCaughn, 280 U.S. 124, 136-138; Burnet v. Wells, 289 U.S. 670, 678. A state is at liberty, if it pleases, to tax them all collectively, or to separate the

faggots and lay the charge distributively, Ibid.
Calling the tax an excise when it is laid solely
upon the use (Vancouver Oil Co. v. Henneford,
183 Wash. 317; 49 P.(2d) 14) does not make the
power to impose it less, for anything the
commerce clause has to say of its validity,
than calling it a property tax and laying it
on ownership. . . .A tax upon the privilege of
use or storage when the chattel used or stored
has ceased to be in transit is now an impost
so common that its validity has been withdrawn
from the arena of debate. . . ." 300 U.S. 577,
582-583.

Scripto v. Carson, 362 U.S. 207 (1960); General
Trading Co. v. Tax Commissioner, 322 U.S. 335 (1944); Nelson
v. Montgomery Ward, 312 U.S. 373 (1941); Nelson v. Sears,
Roebuck & Co., 312 U.S. 359 (1941); McGoldrick v. Berwind-White
Coal Co., 309 U.S. 33 (1940); Felt & Tarrant Mfg. Co. v.
Gallagher, 306 U.S. 62 (1939) and Monamotor Oil Co. v. Johnson,
292 U.S. 86 (1934) also involved the validity of use taxes
imposed by the statutes of the state of the residence of the
purchaser. These cases differed from the Southern Pacific
Company case and Silas Mason Company case in that under the
provisions of the statutes the seller was required to remit
the amount of the use tax to the state and collect from the
user who had purchased the property. In each instance, under
varying facts, the use tax and method of collection was upheld
by the Court.

In Nelson v. Montgomery Ward, supra, and Nelson v.
Sears, Roebuck & Co., supra, each company maintained retail
stores in Iowa, yet both did large mail order businesses on
orders mailed by Iowa residents to out-of-state branches of
the stores which were filled and shipped directly to the
purchaser.

". . .The fact that under Iowa law the sale
is made outside of the state does not mean that
the power of Iowa 'has nothing on which to oper-
ate.' Wisconsin v. J. C. Penney Co., supra.
The purchaser is in Iowa and the tax is upon
the use in Iowa. The validity of such a tax,
so far as the purchaser is concerned, 'has been
withdrawn from the arena of debate.' Henneford
v. Silas Mason Co., 300 U.S. 577, 583; Southern

> Pacific Co. v. Gallagher, supra. . . . .Use in Iowa is what is taxed regardless of the time and place of passing title and regardless of the time the tax is required to be paid. Cf. McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 49." 312 U.S. 359, 363.

> "Respondent, however, insists that the duty of tax collection placed on it constitutes a regulation of and substantial burden upon interstate commerce and results in an impairment of the free flow of such commerce. . . .Respondent further stresses the cost to it of making these collections and its probable loss as a result of its inability to collect the tax on all sales. But cost and inconvenience inhered in the same duty imposed on the foreign corporations in the Monamotor and Felt & Tarrant cases. And so far as assumed losses on tax collections are concerned, respondent is in no position to found a constitutional right on the practical opportunities for tax avoidance which its method of doing business affords Iowa residents, or to claim a constitutional immunity because it may elect to deliver the goods before the tax is paid." 312 U.S. 359, 365.

In speaking of the tax and the method of collection under consideration in Monamotor Oil Co. v. Johnson, 292 U.S. 86 (1933) the Court stated at page 95 of its opinion:

> ". . .The statute obviously was not intended to reach transactions in interstate commerce, but to tax the use of motor fuel after it had come to rest in Iowa, and the requirement that the appellant as shipper into Iowa shall, as agent of the state, report and pay the tax on the gasoline thus coming into the state for use by others on whom the tax falls, imposes no unconstitutional burden either upon interstate commerce or upon the appellant.

> ". . .The distributor does not pay the tax; the user does. . . ."

McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33 (1940) upheld a New York City tax levied upon the transfer of possession of coal mined by Berwind-White in Pennsylvania, sold by contract to residents of New York City and delivered by Berwind-White to the purchaser. The Court further upheld the provision of the statute which made Berwind-White liable to the City for the tax due and required them to collect such tax from the purchaser. The opinion of the Court contains an excellent discussion relating to the balancing of the taxing powers of the states with the regulatory power of Congress over interstate commerce.

Scripto v. Carson, 362 U.S. 207 (1960); General Trading Co. v. Tax Commissioner, 322 U.S. 335 (1944) and Felt & Tarrant Mfg. Co. v. Gallagher, 306 U.S. 62 (1939) all involved taxes levied upon the use of property within the taxing state for which the out-of-state seller was made liable to the taxing state and was required to collect from the purchaser. Scripto, General Trading Company and Felt & Tarrant Manufacturing Company were all corporations chartered under the laws of states other than the taxing state and neither of them were authorized to transact business within such states nor did they maintain any office, warehouse or stock of merchandise within the taxing state. General Trading Company employed traveling salesmen who solicited orders for merchandise; Scripto received orders for merchandise from jobbers and wholesalers under a commission agreement; and Felt & Tarrant Company employed general agents who obtained orders for their merchandise. In all three cases the orders were subject to approval and acceptance at the home office of the company and, when accepted, the merchandise was shipped from the home office to the purchaser. Payment was remitted directly from the purchaser to the company. The Court upheld the taxes and method of collection in all three cases against contentions that they were in violation of the commerce clause and the due process clause of the United States Constitution.

The Felt & Tarrant Company case was based squarely upon the decisions in Henneford v. Silas Mason Co., supra; Monamotor Oil Co. v. Johnson, supra; and Bowman v. Continental Oil Company, 256 U.S. 642 (1921).

In General Trading Co. v. Tax Commissioner, supra, the Court made its position clear in a terse manner at page 338:

> ". . .The exaction is made against the ultimate consumer---the Iowa resident who is paying taxes to sustain his own state government. To make the distributor the tax collector for the State is a familiar and sanctioned device. _Monamotor Oil Co. v. Johnson_, 292 U.S. 86, 93-94; _Felt & Tarrant Co. v. Gallagher_, _supra_."

at page 337-338:

> ". . .We agree with the Iowa Supreme Court that _Felt & Tarrant Co. v. Gallagher_, 306 U.S. 62; _Nelson v. Sears, Roebuck & Co._, supra; and _Nelson v. Montgomery Ward_, supra, are controlling. The _Gallagher_ case is indistinguishable. . . .And the fact that in _Sears, Roebuck_ and _Montgomery Ward_ cases the interstate vendor also had retail stores in Iowa, whose sales were appropriately subjected to the sales tax, is constitutionally irrelevant to the right of Iowa sustained in those cases to exact a use tax from purchasers on mail order goods forwarded into Iowa from without the State. All these differentiations are without constitutional significance."

_Scripto v. Carson_, 362 U.S. 207 (1960) was affirmed squarely upon the basis of the decision in _General Trading Co. v. Tax Commissioner_, _supra_, and involved similar facts.

The foregoing cases clearly hold that a state statute which requires an out-of-state vendor to remit to the state the amount of a use tax imposed upon the vendee and collect such tax from the vendee is not invalid under the interstate commerce clause or the due process clause of the United States Constitution.

Upon the basis of the above cited cases, we hold that the use tax imposed by the Cigarette Tax Law is a valid exercise of the state taxing power and were it not for the restrictive definition of "first sale" contained in the Cigarette Tax Law we would sustain the method of collection upon these authorities. However, since by definition of "first sale" the events upon which payment of the tax is predicated must be in intrastate commerce we must pursue this aspect of the transactions further.

The tax imposed by the Cigarette Tax Law is required to be paid by the person making the "first sale" in this State and the payment of such tax is to be evidenced by affixing a tax stamp to each package of cigarettes. House Bill No. 474, Section 4A, Acts 1965, 59th Legislature, declares that cigarettes received by distributing agents shall be deemed possessed for purposes of making a "first sale" and requires that they pay the tax and affix the tax stamp to the packages of cigarettes.

"First sale" is defined by Article 7.01 (8) to "mean and include the first sale or distribution of cigarettes in intrastate commerce, or the first use or consumption of cigarettes within this State." (Emphasis added.) From the plain wording of this provision it is apparent that the duties imposed upon distributing agents by Section 4A of House Bill No. 474 must be performed only in the event that the activities of the distributing agent constitute a first sale or distribution of cigarettes in intrastate commerce. Even though the cigarettes are, by the terms of Section 4A of House Bill No. 474, declared to be possessed by the distributing agent for purposes of making a first sale within the meaning of the Cigarette Tax Law, the test of whether they are possessed for that purpose is a question to be ultimately determined by federal decisions relating to the subject of what is and what is not interstate commerce for purposes of state regulation. If the cigarettes distributed by the distributing agent are, under federal decisions, in interstate commerce then no declaration to the contrary by our Legislature can take them out of such commerce for purposes of bringing them within the definition of "first sale."

We turn now to the determination of the status of the cigarettes in the hands of the distributing agent.

At the outset we wish to make it clear that we do not consider cases such as Binderup v. Pathe Exchange, 263 U.S. 291 (1923); Stafford v. Wallace, 258 U.S. 495 (1922); Swift & Co. v. U.S., 196 U.S. 375 (1905); and Walling v. Jacksonville Paper Co., 317 U.S. 564 (1943) to be in point upon the question before us. These cases arose under either the Sherman Anti-Trust Act, Packers and Stockyards Act, or the Fair Labor Standards Act. The question in those cases is the extent of the power of Congress to regulate interstate commerce and those business activities and practices which pertain thereto. This is a different question from that of whether a particular exercise of state power is, in view of

its nature and operation, considered to be in conflict with the authority of Congress under the commerce clause. The power of Congress extends to activities which, when considered separately, are intrastate, but which have a close and substantial relation to interstate commerce. Santa Cruz Co. v. Labor Board, 303 U.S. 453 (1938); Atlantic Coast Line Ry. Co. v. Standard Oil Co., 12 F.2d 541 (4th Cir. 1926) reasoning and conclusions approved in 275 U.S. 257 (1927); Bacon v. Illinois, 227 U.S. 504 (1913); Minnesota v. Blasius, 290 U.S. 1 (1933).

Neither do we consider those cases dealing with the original package doctrine or the power of the states with respect to the export-import clause determinative of the question before us. That provision of the United States Constitution which declares that "No state shall, without the consent of Congress, lay any imposts or duties on imports or exports" does not refer to articles brought into one state from another, it refers only to articles imported from foreign countries into the United States. Brown v. Houston, 114 U.S. 622 (1885); Woodruff v. Parham, 8 Wall. 123 (1868); Sonneborn Bros. v. Cureton, 262 U.S. 506 (1923). The "original package doctrine" is also limited in application to articles imported from foreign countries. The distinction is that the immunity from state taxation attaches to the import before sale, while an article in interstate commerce is immune to state regulation or taxation only if it regulates or burdens interstate commerce. Sonneborn Bros. v. Cureton, supra. We also point out that Standard Oil Co. v. Graves, 249 U.S. 389 (1919) Askren v. Continental Oil Co., 252 U.S. 444 (1920) and Bowman v. Continental Oil Co., 256 U.S. 642 (1921) have been overruled insofar as they purport to extend the protection of the "original package doctrine" to articles brought from one state into another. Sonneborn Bros. v. Cureton, supra, page 520.

After consideration of the decisions of the Supreme Court of the United States dealing with the question of when articles in interstate commerce have come to rest for purposes of state taxation or regulation, we are of the opinion that once the cigarettes have arrived at the warehouse of the distributing agent they are no longer the subject of interstate commerce. American Steel & Wire Co. v. Speed, 192 U.S. 500 (1904); General Oil Co. v. Crain, 209 U.S. 211 (1908); Bacon v. Illinois, 227 U.S. 504 (1913); Independent Warehouses v. Scheele, 331 U.S. 70 (1947); Minnesota v. Blasius, 290 U.S. 1 (1933); Susquehanna Coal Co. v. City of South Amboy, 228 U.S. 665 (1913).

While it is contended by the manufacturer that when a carload of cigarettes leaves its plants destined for the

warehouse of the distributing agent in Texas there are contracts covering 50% of the carload and upon arrival at the warehouse 97-98% of such cigarettes have been sold under additional contracts entered into while the car was in transit, the fact remains that upon arrival at the warehouse the cigarettes are the property of the manufacturer. They are billed from the manufacturer to the manufacturer and at the time of shipment and arrival have no ascertainable destination beyond the warehouse. It is only upon the subsequent order of the manufacturer that the distributing agent rebills the cigarettes to purchasers. Although the manufacturer may, at the time a given carload arrives at the warehouse, have accepted and approved orders calling for the delivery of a quantity of cigarettes equal in number to 97-98% of such carload, none of the cigarettes in a given carload are definitely committed to a particular purchaser. The manufacturer is free to fill such orders from cigarettes already on hand in the warehouse to which the carload was sent or from any other warehouse in which it may have cigarettes stored. The figures submitted by the Comptroller's Office indicate that the manufacturers keep on hand at the various warehouses presently acting as distributing agents a supply of cigarettes sufficient to meet daily demands of from 9 to 30-1/2 days. Good business practice dictates that cigarettes already in the warehouse be used to fill orders rather than the fresh stock just arrived from the factory. Cigarettes are in fact distributed from the warehouse on a "first in - first out" plan, and, at the time the cigarettes are shipped from the factory of the manufacturer no particular case or carton of cigarettes can be pointed to as being destined for any place other than the warehouse of the distributing agent.

This method of operation is solely for the business purposes of the manufacturer in facilitating the sale and delivery of its products and to secure the economic advantage of lower freight rates on carload shipments. The facts do not present a case where a delay in transit to the destination is occasioned by the necessities of safety or in furtherance of interstate transportation as was the case in Champlain Co. v. Brattleboro, 260 U.S. 366 (1922).

The facts before us are surprisingly similar to the facts in American Steel & Wire Co. v. Speed, 192 U.S. 500 (1904). In that case, the Wire Company was a New Jersey corporation which had made an agreement with a Memphis, Tennessee warehouse company whereby the warehouse company would receive the Wire Company's products shipped from its factory and billed to itself, warehouse such shipments and

deliver them upon the order of the Wire Company to persons who had purchased the products. The Wire Company contended that the products were merely in transit from the point of manufacture outside Tennessee to persons who had previously purchased them and were thus not subject to a merchant's tax and merchant's privilege tax. In rejecting this contention and holding that such products as were in the warehouse were not in interstate commerce, the Court stated at page 519:

> "With these facts in hand we are of opinion that the Court below was right in deciding that the goods were not in transit, but, on the contrary, had reached their destination at Memphis and were there held in store at the risk of the Steel Company, to be sold and delivered as contracts for that purpose were completely consummated. . . ."

In General Oil Co. v. Crain, 209 U.S. 211 (1908) the company conducted an oil business in Memphis, Tennessee where it gathered shipments of oil from other states, placed it in storage tanks and distributed it to purchasers. Part of the oil was placed in a tank marked for distribution pursuant to orders for oil already sold in other states. The Court held that the first shipment had ended with the storage at Memphis for subsequent distribution and was "for the business purposes and profit of the company"; that the tank in Memphis had merely become a depot in the oil business of the company for preparing the oil for another interstate journey. The language at page 230-231 of the opinion in the General Oil Co. case is especially relevant to the case before us.

> ". . .The company was doing business in the State, and its property was receiving the protection of the State. Its oil was not in movement through the State. It had reached the destination of its first shipment, and it was held there, not in necessary delay or accommodation to the means of transportation, . . . but for the business purposes and profit of the company. It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a locality in the State beyond a mere halting in its transportation. It

required storage there---the maintenance of the means of storage, of putting it in and taking it from storage. The bill takes pains to allege this. 'Complainant shows that it is impossible, in the coal oil business, such as complainant carries on, to fill separately each of these small orders directly from the railroad tank cars, because of the great delay and expense in the way of freight charges incident to such a plan, and for the further reason that an extensive plant and apparatus is necessary, in order to properly and conveniently unload and receive oil from said tank cars, and it would be impracticable, if not impossible, to have such apparatus and machinery at every point to which complainant ships said oil.'

"This certainly describes a business--- describes a purpose for which the oil is taken from transportation, brought to rest in the State and for which the protection of the State is necessary, a purpose outside of the mere transportation of the oil. The case, therefore, comes under the principle announced in American Steel & Wire Co. v. Speed, 192 U.S. 500."

It was held in Susquehanna Coal Co. v. South Amboy, 228 U.S. 665 (1913) that the storage for distribution of coal, under facts similar to the American Steel & Wire and General Oil Co. cases, was not within the protection of the interstate commerce clause. See also Independent Warehouses v. Scheele, 331 U.S. 70 (1947).

As a general rule, where the owner of property withdraws it from the stream of interstate commerce for his own benefit and business purposes and brings it to rest within the state under his control and subject to disposal at his direction, such property becomes a part of the mass of property within the state and is subject to regulation. Brown v. Houston, 114 U.S. 622 (1885); Bacon v. Illinois, 227 U.S. 504, (1913); Minnesota v. Blasius, 290 U.S. 1 (1933).

We therefore hold that shipments from the warehouse by the distributing agent upon the order of the manufacturer are distributions or sales in intrastate commerce within the meaning of the definition of "first sale" in Article 7.01 (8) and are not protected from state regulation by the interstate

commerce clause.

As to the question of whether the exaction of the payment of the tax from the distributing agent and the ensuing cost of affixing the tax stamp to the packages of cigarettes deprives the distributing agent of property without due process, we hold that it does not.

Under the facts before us, we consider the distributing agent to be exactly what the term implies---an agent of each manufacturer of cigarettes which it contracts to serve. While, as the facts reveal, each of the 10 distributing agents now operating in this State are public warehouses, this fact does not change their relationship with the cigarette manufacturers. Each of these public warehouses have contracted, with the respective cigarettes manufacturers which they serve, to receive shipments of cigarettes belonging to the manufacturer, unload them from boxcars, sort and store them in their warehouse, and, upon the subsequent order of the manufacturer, rebill and deliver to carriers specified quantities of cigarettes for purchasers located in Texas who have placed their orders directly with the manufacturer. That the contracts between the warehouses and the manufacturer may by their terminology designate the relationship as something other than that of principal and agent or the fact that the warehouse may serve any number of principals does not affect the legal significance of the relationship as one of agency. Any doubt in this respect is specifically resolved by Article 7.01 (16) which makes those persons performing the services rendered by the warehouses in question <u>agents</u> of the out-of-state manufacturers.

The payment of the tax is occasioned by the performance of acts which are within the scope of the agency relationship. If the warehouseman does not act as the agent of a cigarette manufacturer then no payment of the tax is exacted from him. No one is compelled to act as a distributing agent for the manufacturer and should anyone choose to so act they should assure themselves that they will be reimbursed by their principal for the taxes paid in the course of such agency.

<u>Bowman v. Continental Oil Co.</u>, 256 U.S. 642 (1921); <u>Monamotor Oil Co. v. Johnson</u>, 292 U.S. 86 (1934); <u>Felt & Tarrant Mfg. Co. v. Gallagher</u>, 306 U.S. 62 (1939); <u>Nelson v. Sears, Roebuck & Co.</u>, 312 U.S. 359 (1941); <u>Nelson v. Montgomery Ward</u>, 312 U.S. 373 (1941); <u>Wisconsin v. J. C. Penney Co.</u>, 311

U.S. 435 (1940: and General Trading Co. v. Tax Commissioner, 322 U.S. 335 (1944) are all directly opposed to the contention that the imposition upon an out-of-state vendor of personal liability for the collection of use taxes exacted by the state of the vendee violates the due process clause of the 14th Amendment to the United States Constitution. We can perceive of no reason why the rationale of these decisions would not apply with equal force where the collection of such tax is made through the agent of the vendor. The fact that a substantial expense is involved in the rental of machines and employment of operators necessary to affix the stamps to the cigarettes does not alter our decision upon this question. Reliable figures furnished to us by the Comptroller indicate that the 2-1/4% discount allowed those who are required to purchase and affix stamps to cigarettes not only offsets the expense of such operation but affords a substantial profit. Under such circumstances there is no denial of due process.

In answer to your first question, you are hereby advised that under the provisions of Section 4A of House Bill No. 474, Acts 1965, 59th Legislature, distributing agents are required to pay the taxes assessed by the Cigarette Tax Law and affix the tax stamps to all cigarettes distributed by such agent prior to the time the cigarettes leave the warehouse of the distributing agent for delivery within this State to anyone other than an exempt consignee.

In this connection, you are further advised that the term "exempt consignee" has reference to those persons who are authorized to receive and distribute or sell unstamped cigarettes. When cigarettes leave the warehouse of a distributing agent under a bill of lading, "consigned to" a person authorized to receive and distribute or sell unstamped cigarettes, the distributing agent is not required to pay the tax or affix the stamps to such cigarettes. Any other construction of the term "exempt consignee" would be in direct conflict with the other provisions of Section 4A which provide that every distributing agent shall be treated as a "distributor" and the distributing agent shall pay the taxes assessed by this Chapter and affix the stamps.

Your second question inquires as to what effect Section 4B of House Bill 474 will have upon Article 7.01 (16) and Article 7.23 (1), (3) and (4).

Section 4B of House Bill No. 474 merely repeals Section 2 of Article 7.23 and has no effect upon the other provisions of the Cigarette Tax Law which you mention in your second question. We wish to point out, however, that Section 4A of House Bill No. 474 by amending Section (1) of Article 7.23 "to read as follows" completely replaces such section.

### S U M M A R Y

The tax imposed by the Cigarette Tax Law is a valid use tax.

Section 4A of House Bill No. 474, Acts 1965, 59th Legislature, is constitutional and by its terms "distributing agents" are required to pay the tax assessed by the Cigarette Tax Law and affix the tax stamps to all cigarettes prior to the time such cigarettes leave the warehouse for delivery in this State; provided that no tax need be paid or stamp affixed to cigarettes which leave such warehouse for delivery within this State on a bill of lading "consigned to" a person who is authorized under the law to receive and distribute or sell unstamped cigarettes.

Section 4B of House Bill No. 474, Acts 1965, 59th Legislature, merely repeals Article 7.23 (2) and has no effect upon Article 7.01 (16) or Article 7.23 (1), (3) and (4).

Very truly yours,

WAGGONER CARR
Attorney General

By _W. O. Shultz_

W. O. Shultz
Assistant

WOS:ml

APPROVED:
OPINION COMMITTEE

W. V. Geppert, Chairman
Kerns Taylor
John Reeves
Arthur Sandlin
John Banks
Bill Allen

APPROVED FOR THE ATTORNEY GENERAL
BY: T. B. Wright